Good morning. Mr. DeRuzo. I'm Joseph DeRuzo. I'm a law firm at First Edelman, Miami, Florida. On behalf of the appellant, Mr. Carl Simon, I would request, given my 15 minutes, that I reserve three for the bottle. Okay, that request will be granted, Mr. DeRuzo. Thank you very much, Your Honor. This is admittedly a very complex case, and I do believe that all six points made in the brief warrant relief. However, given the limited time that I have here today, I would like to focus the Court's attention on points 1, 2, and 6. However, before I delve into the weeds, so to speak, of this case, I feel I have an obligation to this Court to address a matter that actually was brought up in the Jillian Mark case. And I admit, I actually do say this with a bit of trepidation, but I think the Court needs to be aware that at the Federal level, in my opinion, there is a CJA panel, but it appears that attorneys, for no good reason, are appointed on Federal cases who are not on the panel on cases where there are not that many defendants. For example, if it was a 15-person Federal drug trafficking case, if you needed to go off the panel for attorneys 7 through 15, I would understand. But in cases where a second defendant, members of the Bar are often appointed to those cases that I still don't understand. At the local level, members of the Bar are everyone gets them, irrespective of capacity, irrespective of practice area. And as a result, many attorneys do whatever it takes because they either lack the desire or they lack the skill set to, in essence, get off their appointed criminal case. And now that dovetails into the problems that I have and the problems that are present with the Anders brief that was submitted by Attorney Herman Purcell to the District Court Appellate Division in what I characterize in my brief as Simon No. 9. Now, in Simon No. 9, Ms. Herman Purcell submitted an Anders brief, but she wasn't the first person or the first attorney on the case. Actually, Ms. Moss was appointed to her case and Ms. Herman Purcell, after Ms. Moss filed an Anders brief herself, Ms. Herman Purcell picked up the case. Now, after Ms. Herman Purcell got the case, the District Court Appellate Division remanded the case to the Territorial Court for consideration of whether there should have been a Certificate of Probable Cause. A Certificate of Probable Cause was issued by Judge Carroll. That Certificate of Probable Cause listed two discrete issues for the Appellate Division's consideration. The first, whether harmless error is the appropriate standard based on the improper amendment of an information. A question about, okay, continue that. And the second, whether there was an allegation that the Appellate Division should consider regarding a Brady violation. Those two discrete issues, the Territorial Court certified as having probable cause as being facially sufficient. The case then went back to the Appellate Division in Simon No. 9, and at that point in our position, Ms. Herman Purcell should have retracted her Anders brief and at a minimum briefed those two issues. However, Ms. Herman Purcell never retracted her Anders brief, and the District Court Appellate Division, in essence, granted her motion withdraw and found that her Anders brief was legally sufficient. Mr. DeRuza, we have this question before you get to the Anders brief, and thank you for laying those facts out there. Before you get to the Anders brief, we have this question, that there is a case in the Virgin Islands Supreme Court, and there is this habeas case before our court. And one of the keys is the question is who has jurisdiction, who properly has jurisdiction during the changeover. When that case was returned from the Superior Court to the Appellate Division, did it get the same case number when it came back? Yes. It did? Yes. It wasn't a new case? Just to be clear, the case started out at what I call Simon 6, it went up to the Appellate Division at Simon 9, it got remanded for consideration of whether it was a probable cause. To the Superior Court? Yes, to Judge Carroll. When it comes back to the I understand it was a record remand, it was not a case remand. That's my understanding, but to be perfectly frank, it's not particularly clear. So that's your argument? Yes. But I would say that, well, first of all, the order speaks for itself, which is in the appendix, but I do believe that when an appellate court considers whether it has jurisdiction, whether a certificate of appealability or a certificate of probable cause should have been granted or there was one, that is a record remand. That is not a full remand such as, you know, a reverse remand for certain procedural errors. But when it comes back to the Appellate Division, the District Court's Appellate Division, the certificate of probable cause gets filed under the same number. That's my understanding, correct. At least in this case, I'm almost 100% positive that it didn't. So to that and to answer the Court's question, the ongoing litigation currently in the Virgin Islands Supreme Court stemmed from a local level habeas petition filed in Simon 11 that I want to say was filed in the beginning of 2009. That was after the Virgin Islands Supreme Court took appellate jurisdiction and then as a result appealed to the Virgin Islands Supreme Court while this case was pending and I was appointed to represent Mr. Simon. That's currently going in respect to Simon 12 pending before the Virgin Islands Supreme Court. And that's still alive. Yes, it is. It hasn't been stayed. Well, I move to stay the consideration of that case because in all fairness, not only to this Court, to opposing counsel and to the judicial system in general, this case that we have here stems from Simon 6 which was a 2000 case. It obviously has been stayed in the Supreme Court. Negative. Unfortunately, the Virgin Islands Supreme Court hasn't taken any action on my motion to stay. So they didn't take action. It's pending. Did the government oppose that motion? Yes, I believe the government opposed the motion because the government feels and I believe the government feels that the Supreme Court should be able to investigate these issues and then this Court would be able to exercise discretionary review petition for cert which I don't believe is appropriate given the procedural posture of this case. All right. We don't have a lot of time left and you've covered Anders and you've talked about the jurisdictional issue and the venue issue, whichever it is. The issue that I'm concerned about is whether or not there was any tacit agreement. Your Honor, I believe the transcript in Mr. Roach's sentence speaks for itself. I believe that there was, and it's in the transcript, he was approached while his appeal before this Court was pending and he gave off his statutory right to appeal in exchange for a reduction of sentence and Well, does the record show whether he was approached or he approached the government? I believe the testimony before Judge Moore who presided over the case on behalf of Mr. He did not do the approaching. He did not reach out to the prosecution to give this offer of assistance. He was approached in order to testify against my client, Mr. Simon. Now, it's a matter of debate of who did the approaching. However, I don't think that is really of any import because unlike cases where the government has cited the unpublished case out of the Fourth Circuit which did, I believe, in turn cite this case or Puello out of this circuit, those, in this case, you have two co-defendants allegedly committing the same act at the same time and the only reason that they were allegedly tried in two different courthouses was because of the change in jurisdiction under 4 Virginia's Code 76 subsection B. That is the only difference. This is not two unrelated acts, two unrelated conspiracies with perhaps one actor in common. This was a first-degree murder where the alleged accomplice who was convicted before the district court then in turn is approached to testify against my client in territorial court. So, in February of 95, your client is convicted. Is that right? That's my understanding, yes. February of 1995. And your argument is at that time there is either a tacit or oral but not written understanding between Mr. Roach and the U.S. Attorney's Office that led to the testimony of Mr. Roach at your client's trial. Exactly. There was a quid pro quo. The fact that it was not memorialized until several months later I don't believe is of any import. That would allow the prosecution or the government to just postpone putting in writing an agreement and all you need for the agreement is a simple meeting of the minds. So, the fact that it was not memorialized or reduced to writing several months later I don't think should control this case. Well, since it wasn't reduced to writing, when Mr. Simon was convicted in the territorial court in February of 95, his counsel who cross-examined Roach fairly lengthy cross-examination, he certainly knew that Roach had been convicted here, who is now testifying against his client there, and that something must have happened. And Roach says, well, something that happened is I was granted protection. I felt that I was going to be protected. Yes. But nowhere in that cross-examination does counsel for Simon try to go into whether or not there was a deal. Well, the record speaks for itself and I would agree with that. And the problem is, I would say that if the appropriate broidy information was given, that was fertile ground for cross-examination. Given that Mr. Roach, who is the only person to place my client Even you said that there wasn't any. Assuming that there wasn't any deal that had been transcribed, that had been put in writing, if there wasn't anything but a tacit deal, what is it that you wanted the government, what is it that is the broidy material that the government should have disclosed? Oh, I believe there was a deal. It may not have been memorialized, but I believe at a minimum the deal was testify against my client and give up your statutory right for an appeal before this court. And we'll help you. And we will help you. And even though it wasn't in writing, that kind of deal should have been disclosed prior to the Simon trial. Absolutely. Absolutely. Broidy requires it. Due process requires it. Maybe you cited it, but I don't remember you citing it. What's your best case that that deal should have been disclosed? Perhaps I'm mispronouncing it. It's Puello. Palula. Palula. Okay. Yes. I was on that case. Palula. That is a very different case. It is a very different case, but I would say the proposition of law is a quick one in this case. You mean that an oral agreement would have to be disclosed? Yes. Okay. Ms. Monrose. Good morning. This is Susan from the court. My name is Tiffany Monrose, and I represent the government of the Virgin Islands. Can you keep your voice up, please? Yes, Your Honor. I just want to apologize because the earliest flight that I could get over was the 940 flight, and I know the cases were called out of order, so I apologize to the court. That apology will be accepted. Go ahead. You can proceed. Thank you. Ms. Manning. Yes, Your Honor. I know the court addressed the issue of jurisdiction with the appellant. I just want to make it clear that I did not believe, I believe that sequentially, when the superior court ruled and the appellate division reviewed that decision and the decision of the appellate division came to this court, I'm not challenging whether or not that was the proper procedural course for this court to hear the case, and I was not challenging whether there was a proper procedural course for Simon's 2009 writ of habeas corpus petition should go to the Supreme Court because they did assume jurisdiction in January of 2007. What I was saying in the case of, I believe it's five towns or five guys, this court looked at that case and found that the appellant was attempting to go before the U.S. Supreme Court to challenge the constitutionality of a statute while asking this court to consider whether or not the statute was discriminatory, and in that case, this court determined that it would not allow a split appeal. Essentially, the statute was being challenged on two fronts, and it would be challenged before two different courts. And I was trying to... This is not an appeal of one case. This is two separately filed cases, and it doesn't matter which one. Isn't that ample distinction from five guys? I would say no, primarily because the issues raised in the 2009 writ of habeas corpus petition were the same issues raised in the appellant's 2000... Right, but it was a two separately filed case. Yes, Your Honor. Five guys was one case. It was having different issues appealed differently. I actually looked at the issue as being similar, but I understand the court's distinction that the issues were not similar and challenging the constitutionality and challenging whether or not something was discriminatory. Now, if they are the same issues, if this was a record remand, I think you have jurisdiction. And I, personally, I reinforce that. Do you think it was, when, when the appellate division remanded a case to the superior court, to the certificate of appealability, do you think that was a record remand or a case remand? I'm actually not familiar with those terms of arts between record remand and case remand. My understanding is if this court reversed and sent the case back, it would, I would imagine it would be a case remand. Okay, yes. If you send it back to say, give a further transcript, that would be a record remand. Yes, Your Honor, I agree. And if you send it back to say, get a certificate of appealability, and it comes back and has the same case number, I would tend to say that's a record remand. I would agree with the court. I would agree with the court. So, if we have jurisdiction and this case is much older, why should we not be the court to take this to final decision as opposed to the Virgin Islands Supreme Court in the later trial case? Well, Your Honor, the appellant was essentially form shopping and trying to have both courts decide the case at the same time. So shouldn't the case, shouldn't the court, if he is form shopping, shouldn't the court with the older case be the one to finish it through? I see your point, yes, Your Honor. Yes, I see your point, Your Honor. I just would like to address the issue that was raised by the court with respect to the Brady violation, the alleged Brady violation. I would submit that the government of the Virgin Islands did not commit a Brady violation in this case. The appellant was required to show that the evidence was suppressed, that it was favorable and that it was immaterial to his case. In this case, the appellant is alleging that he was not aware of the agreement between the U.S. Attorney's Office and Roche, James Roche, his accomplice. They were not co-defendants. Roche was tried in the district court before the territorial court had expanded jurisdiction. They were never co-defendants. And Carl Simon was tried in the superior court after it expanded jurisdiction. And the agreement, as you can see from the transcript, U.S. Attorney Patterson indicated that his former colleague, Susan Villa, who was never an assistant attorney general, approached James Roche's attorney, I believe Leonard Francis, about a possible settlement to avoid an appeal, to avoid the appeal that he had filed. The government of the Virgin Islands was not representing, was not, did not participate in the prosecution. And the, Susan Villa was not a part of the prosecutorial team that prosecuted Carl Simon. And this court in Palelo stood for the proposition that if the government cannot be bound to be aware of or disclose information by other information in, within other government offices, and I also cited the case of U.S. v. Smith, which is out of the Fourth Circuit, which reached a similar conclusion. And in that case, you are not dealing with a territorial prosecutor and a federal prosecutor. You're dealing with two federal prosecutors for the U.S. Attorney's Office. Yes, but, but there's a… Here's what I don't understand. Here's what I don't understand. So you agree that, with Appellant's Counsel, that there was an agreement and there were terms to the agreement? I would agree with the Appellant's Counsel that there was an agreement between the U.S. Attorney's Office and James Roche approximately seven months after Carl Simon's conviction. And I just wanted to amplify for the court… So you mean, so you mean to tell us that during his testimony, he was convicted in February, Simon was convicted in February of 95? Yes. So trial was before or after the day he was convicted. But at trial, at the time of trial, Roche had no agreement with the U.S. Attorney's Office? There is no evidence in the record that Attorney Faber, Assistant Attorney General Faber, was aware of any agreement with the U.S. Attorney's Office and James Roche. And James Roche was asked during cross-examination whether or not he was made any promises, and he answered in the negative. And that was a part of the record. I was trying to find it while Attorney DeRuzo was answering your question, but I could not find it. But after he talked about the fact that he sought protection, there were several questions asked, and finally he was asked whether or not he was made any promises, and he said no. That written agreement… But he said just for protection. After that dialogue, there were several other questions, and he was asked specifically, were you made any promises for testifying? And he answered no. I honestly tried to find it in the transcript, but I could not find it, find the exact page. He did say he had an understanding with regard to protection. Is that, is your view that's not sufficient to constitute an agreement? Or… I'm not quite sure what your position is on that. Well, he indicated that he got protection, and… For what? It is assumed, I assume from… I'm sorry? That no one would kill him if he testified against him. Isn't that an agreement? Not with the Attorney General's office. He was not, there was nothing in the record. So you don't think that that is information that a jury should know about Roach testifying? But if it's information that a jury should know, that information was disclosed during the trial. Okay, but here's the question I have. Isn't it a bit incredulous for us to believe that you had dumped in your lap, your predecessor, whoever tried the case, had dumped in his lap in February of 1995 a convicted felon, someone convicted of this murder, who all of a sudden is going to be a witness for the Virgin Islands, without having some agreement. Isn't it a bit incredulous to believe that? I would say no. I spoke to one of the two prosecutors. Things just happen like that. Your Honor, I'm not going to say that it normally works out that way. I would say that in this case, I spoke to one of the two prosecutors who still works for the office, and I asked him, was there an agreement? Was there any offers that were made to James Roach for his testimony? He told me, not to his knowledge, Attorney Faber was in communication with Leonard Francis and also trying to encourage, because he was reluctant to testify on the eve of trial. He was reluctant to testify, so I can't imagine that there would have been this sweetheart deal of going from first-degree murder to second-degree murder and serving only 20 years instead of life. If he had such a sweetheart deal in his back pocket, why would he be reluctant to testify on the eve of trial? He indicated in the transcript that he wasn't promised anything. Well, the answer to that is he was still afraid. Right. My understanding from the transcript is that he was harassed at the location that he was detained at in Puerto Rico by relatives of Simon, and so he felt that his life was obviously at risk because apparently it was Simon's relatives that were at the same location, and he was moved. It seems to me that what you're arguing is, okay, there may have been a deal, but it was with the U.S. Attorney's Office, and Assistant Attorney General Farber didn't know anything about it. That's exactly right. In fact, not only didn't he know anything about it, he didn't even know that there was one. But my point is, here dumped in his lap comes the key witness who's going to say who killed the victim on St. John. What we don't have in the record is the letter from Attorney Farber, which would shed some light on whether or not he had prior knowledge of this agreement that could have been relayed to Carl Simon's attorney. We don't have that in the record. But what you do have in the record from Roach's own testimony is clear testimony that there was an agreement out of which at least protection came. He was offered protection. He didn't say that that protection would have allowed him to have a reduced sentence and a change of the charge that he was convicted of. What would be the reason for the government to give a defendant protection? The government only does quid pro quo. I'm not aware of the government extending niceties to witnesses. In this case, he was approached by Susan Nevia, not by the Attorney General. There was no signatory line for the Attorney General. We had no authority to approve or disapprove that agreement. And under this court's decision in Paliello, you cannot impute that knowledge or find a Brady violation where this other government agency, a federal government agency, is doing the prosecuting. You knew the U.S. Attorney's Office was prosecuting him, right? Yes. He was convicted at that time, yes. And so I come back to Judge Fischer's question, right? Yes, Your Honor. You know that he's being prosecuted by the U.S. Attorney's Office. What possible reason would there be for him to come and just say, I'm yours, with no understanding of what lays ahead? Yes. You have to assume two things. If the government knew about a quid pro quo agreement between the U.S. Attorney's Office and James Roach, you'd have to assume that they allowed him to lie during his testimony when he said that he wasn't promised anything in exchange for his testimony. Well, he said he was going to be protected. So in his mind, that's not nothing. Palullo involved discovery in Florida and a prosecution in Eastern District of Pennsylvania. And the fact that the U.S. attorneys involved in the Florida discovery didn't – that the attorneys in Pennsylvania didn't know what was going on in Florida, I think, is very like the Virgin Islands. That's correct, Your Honor. And I think in that case, the court also looked at the fact that the investigators or employees of the Public and Welfare Benefits Administration, while they may even have been knowledgeable of or somehow participated in the investigation, that it still wasn't a Brady violation. Are you aware of any cases that say a witness is being prosecuted, one U.S. attorney's office and is going to testify in another, that the fact that he's being prosecuted and has a deal with one shouldn't be imputed to the other office and therefore provided pursuant to Brady? Are you aware of any cases that say that? Well, the case I cited in my brief, United States v. Smith, which is a 2010 Fourth Circuit case in which there was a prosecution in Georgia and there was a prosecution in North Carolina, and the appellant alleged a Brady violation because the prosecutors in Georgia didn't disclose that a potential defendant who had ties to the prosecution in North Carolina was not disclosed to those particular defendants. And the court found in that case that there wasn't a Brady violation. Actually, I'm talking about witnesses. Witnesses. Yes. I mean, my hypothetical using the facts from Smith is there's a person who's being prosecuted in Georgia who can testify in North Carolina. Obviously, the defense counsel in North Carolina has to know about the deal in Georgia, right? Well, at least the prosecution. He would know about the prosecution if he did. Right. If he was aware. He would know whatever the contours of the deal would be, right? If there was a deal or sorts for testifying in their North Carolina case. And even in that case, the Fourth Circuit found that there wasn't a Brady violation. And I would submit that the court could apply the holding of Paliello and also Smith to find that in this case, the record does not demonstrate that there was any prior knowledge on the part of the Attorney General's Office, specifically Assistant Attorney General Timothy Faber, with respect to any quid pro quo agreement between James Roach, which was reached seven months after Simon's conviction. And the hearing was not held until almost a year after the conviction. And I would submit, in addition, that the appellant raised the fact that several attorneys were ineffective. Oh, I see I've reached over my time. Several attorneys what? Were ineffective in their assistance, and several of those attorneys did not represent the appellant at the time of his February 2000 writ of habeas corpus petition, and thus those arguments are waived. While the defendant was pro se, he could have filed a subsequent writ of habeas corpus petition, and we know that he's done that in the past, and he certainly could have alleged the violations of those attorneys with respect to ineffective assistance of counsel. He assigns error with respect to Attorney Ayala for failing to establish a trial record, but we know from the record that Attorney Ayala met with him at least ten times to discuss strategy, and despite alleging that he had alibi witnesses to support his gambling, the fact that he was gambling on the night of the crime, he failed to provide that information, and the only information he gave was the nickname of possible alibi witnesses without names or addresses of any of these persons. And I would submit in this court's decision in Lewis v. Horne that it found that that did not amount to ineffective assistance of counsel, whereby the appellant failed to cooperate with his attorney. Some of the other issues he raised with respect to Ayala were waived because they were not raised in the February 2000 writ of habeas corpus petition. Specifically, I'm referring to the challenges to the closing of the courtroom, the fact that Daniel Ward was not called to testify, and that the two police officers were not called to testify. What about Mr. Conner? What about not calling Mr. Conner the only witness other than Roach to the crime? The only living witness. What about that? Well, I believe that the reason why he didn't call Mr. Roach, he intended to call the police officers, which would bolster Conner's testimony that he did not identify by face Carl Simon. But those police officers didn't come in. I would presume that Conner didn't come in because Attorney Ayala was relying on the fact that he would have these alibi witnesses that would demonstrate that Carl Simon wasn't even at the scene of the crime, and that information was never turned over to Attorney Ayala, despite numerous attempts to meet with Carl Simon and numerous attempts to cooperate with him. The reason why he indicated in that hearing before, I believe, Judge Finch, that he wanted, in the section 2255 hearing, he indicated that he wanted to be removed as counsel because he felt that his client was not cooperating with him and he could not prepare a defense. Not because he felt that, well, you know, we just couldn't get along and, you know, I don't like my client. He really advocated on behalf of his client and attempted to get his client to communicate with him so he could prepare a proper defense. Even if Attorney Ayala had investigators to assist him with merely just a nickname, no last name, no real name, no address, it's not even clear a week before trial if an investigator would have found those witnesses or potential alibi witnesses. Okay. Thank you. All right. Ms. Munrose, thank you very much. Your Honor, I . . . Mr. DeRuzo. Thank you, Your Honor. What we have here is an unfortunate, I would say, comedy there that is not funny at all. Mr. Ayala and what happened, if he had the knowledge of the quid pro quo, I would agree with Judge Greenaway's remark that co-defendants, co-accomplices just don't come into court to testify for nothing. At that point, because he was represented by counsel, by Mr. Francis, most competent counsel would say, if you're going to give away something, you better get something for it. Or as one friend once told me, if you do something well, don't do it for free. There was something that happened. He was given a quid pro quo, or at a minimum, he was offered protection. Now, this protection that came out during trial, that my client's brother was going to kill Mr. Roach, I would say, at a minimum, that protection should have been, that notice of protection, that braiding information should have been given before. But at the trial, Mr. Ayala did not object. I can't think of anything more objectionable than when a criminal defendant is on trial for murder of one, when his co-defendant, alleged co-accomplice, says that my client was going to have him killed. What could be more prejudicial than that? And that leads into my next point. My client filed an original habeas. That habeas that was originally filed, he filed it pro se, which was Simon 2. It was denied. It goes up on appeal, and Mr. Arturo Watlington is appointed to represent him at the appellate division level. That appeal is dismissed for failure to file a brief. And that ties back in to the problem I have with Anders and the habeas context. Where is the remedy? If there is no right to counsel, and then a counsel who is appointed drops the proverbial ball for his client, when his client, I would say, has a reasonable expectation that his attorney, the appointed attorney, would do his job. When that appointed attorney drops the ball, doesn't file a brief, where there's a miscarriage of justice at the habeas level, there is no remedy. The way I read the current – Under Anders, if you file a proper brief, you will have reviewed all those issues. So, Art, what you're saying is if you, under the title of Anders, file an inadequate brief, that's bad. Does that have anything to do with really following the Anders procedure, which requires a pretty close review of the record and description of the issues involved, and of the lack of merit of those issues? If I may answer the question with this. When you have Anders, you have a statutory right for direct appeals. It's my understanding that direct appeals in a criminal case have only recently, in the last hundred years or so, come about. Whereas, the right to a writ, the writ of habeas corpus, is in common law, dates back to Magna Carta, and is mentioned in the Constitution itself. So that when you have Anders, you have counsel's obligation to the bar, to the court, and his obligation to the client that is being balanced. If counsel does his job and determines that there is no merit and there's nothing in it, and he goes forward with an Anders brief, you have the ability to fall back on the writ, to correct the miscarriage of justice. But at the habeas level, if, let's say, an Anders brief is filed, and that attorney is wrong, and the court agrees that the Anders brief is facially sufficient, is legally sufficient, at that point, if there's a miscarriage of justice at the habeas level, there is no relief for the petitioner. And that's where I see the biggest problem that really comes to pass in Simon 5, when my client's own attorney fails to file a brief and gets his habeas case dismissed for want of prosecution. There is no remedy. A malpractice suit is not going to be – if there are improper Anders or inadequate Anders, isn't there the same remedy? I would say – An Anders brief is not a duck. An Anders brief, if it's done appropriately, is a very serious consideration in the case, in saying I have reviewed all these issues carefully, and there is nothing of merit. And if there – you know, if an improper Anders brief is filed in a direct appeal, the court has – when that happens, we send it back. We say this needs to be re-briefed. We appoint new counsel. And if an Anders brief is filed in the appeal of a habeas corpus, isn't that same remedy available? The court at the appellate habeas level can look at it and say the Anders brief at the habeas level is insufficient as a matter of law and either appoint new counsel or tell the attorney to do it again or to file a merits brief. But unfortunately, that's not what we have here. My problem is what happens when there is a mistake? What happens when the attorney that files the Anders brief, perhaps in good faith, perhaps because he's not competent, perhaps because he's a member of the bar looking to get out of the case whenever possible, files the Anders, and then the appellate court determines based on the record, which is obviously circumscribed in a collateral proceeding, determines at that point that the Anders brief is legally sufficient. But there are other things. For example, in this case, the transcript of Mr. Roach that I personally obtained from the district court file that obviously none of my predecessors who represented Mr. Simon ever bothered to do. What happens when that comes to pass? There is no remedy, especially because it's my understanding the right to successive writs, successive 2255s have been limited by Congress. I follow what you're saying. But if this appointed counsel who doesn't want to really make any effort and doesn't see any merit to the case, instead of filing an Anders brief, files a brief that discusses issues without really going into what's there, isn't that the same outcome that you get? You have an insufficient brief improperly done by an attorney who doesn't want to look into the case. Whether you call it Anders or not Anders isn't the same. It's similar. I guess my problem is what happens for the criminal defendant when that happens? If I make this point, although I don't address it in my brief, criminal defendants can file their own pro se brief. And that should inform the court. But that makes two key assumptions. One, the client, criminal defendant, speaks English. And two, he's functionally literate. And I can tell you from personal experience, especially in the Virgin Islands, those are two assumptions that I don't think a court should make. So that the protection of an Anders brief that the criminal defendant or the habeas petitioner can file something to say, you know what, there's something here, you need to take a look at it, is not necessarily given to every single criminal defendant. And that's part of the systemic problem that I have with an Anders. I would just take the position that file a merits brief and go. But what I'm saying is that the attorney who would file an Anders brief is probably going to file an inadequate merits brief too. Probably, yeah. I would have to agree to that. So, I mean, if they're going to file an inadequate brief, what difference does it make what you call it? I see the court's logic. I guess my only response to that would be, hopefully, in writing a merits brief, the attorney would realize the error of his ways and may uncover something in the process of really looking at the record and really doing a good job on his brief. Other than that, I don't know what the solution to this thorny problem is. Mr. Derriza, we thank you. Your time is up. Thank you very much. I appreciate it. And we thank both counsel for excellent arguments, and we'll take the matter under advisement. Thank you.